Edgar A. Levy Leasing Co., Inc., Appellant, v. Jerome Siegel, Respondent.

First Department, December 24, 1920.

**Landlord and tenant — constitutional law — Laws of 1920, chapters 136 and 944, relating to suits by landlord to recover increased rentals, are constitutional — Code of Civil Procedure, section 2231, as amended, which relates to and limits landlord's right to maintain summary proceedings, is constitutional — exercise of police power by Legislature during emergency created by war — profiteering by landlords may be restrained — restriction of power to contract — said statutes not discriminatory.**

Chapter 136 of the Laws of 1920 and chapter 944 of the Laws of 1920, amending the same, which in substance provide that in cities of the first class and in cities in a county adjoining a city of the first class it shall be a defense to a landlord's action for rent that the same is unjust and unreasonable and that the agreement therefor is oppressive and which create a presumption that the agreement is unjust if the rent has been increased over that of the preceding year, which statutes are to continue in force until November 1, 1922, are constitutional as a justifiable exercise of the police power to prevent so-called " profiteering " by landlords during the extraordinary conditions and emergencies created by the late war.

So, too, chapter 945 of the Laws of 1920, which amended subdivision 2a of section 2231 of the Code of Civil Procedure, enacted by chapter 139 of the Laws of 1920, relating to summary proceedings in cities of the first class and in a city in an adjoining county, which in effect confines said proceeding to a case where the landlord demands no greater rent than that for which the tenant was liable for the preceding month and also permits the tenant to defend on the ground that the rent is unjust and unreasonable and that the agreement therefor is oppressive, is constitutional.

As the remedy by summary proceedings is statutory it is competent for the Legislature to withdraw it altogether or to limit it as aforesaid which has the effect of leaving a landlord claiming the benefit of an agreement for increased rent to an action to recover the same if he refuses to accept a tender of the rent equal to that paid for the preceding month.

It seems, that the provision of chapter 944 of the Laws of 1920, making an agreement for an increased rent presumptively unjust, unreasonable and oppressive, is merely a rule of evidence which it was competent for the Legislature to enact and make applicable to existing contracts.

Where a renewal lease at an increased rent was made after the enactment of chapter 136 of the Laws of 1920 but before said statute was amended by chapter 944 of the Laws of 1920, the answer of a tenant sued for the increased rent which alleges that the same was unjust and unreasonable

and that the agreement was oppressive, states a good defense as he could present that issue under either statute.

The fact that the Legislature has never before exercised a similar police power does not prove that such police power does not exist.

Said statutes limiting a landlord's power of contract for the public welfare, safety and health do not offend the clause of the State Constitution forbidding the taking of private property for public use without just compensation nor the provisions of the State and Federal Constitutions providing that no person shall be deprived of life, liberty or property without due process of law, nor the constitutional provision affording to all the equal protection of the laws.

It is not decided as to whether it will be competent for the Legislature to regulate such leases at any and all times, but said statutes are constitutional during the continuance of the emergency which called for their enactment.

*It seems*, that said statutes do not compel landlords to make such leases and they are at liberty to discontinue leasing their property for housing purposes.

Said statutes are not unconstitutional upon the ground that they fail to prescribe a standard by which what constitutes a reasonable rental may be determined.

Nor are said statutes unconstitutional as unjustly discriminatory and in violation of the Fourteenth Amendment of the Federal Constitution, for they are confined to property devoted to the same use and embrace all property applied to such use.

CLARKE, P. J., and DOWLING, J., dissent, with opinion.

APPEAL by the plaintiff, Edgar A. Levy Leasing Co., Inc., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 26th day of November, 1920, denying plaintiff's motion for judgment on the pleadings, consisting of the complaint and answer.

The complaint alleges that the plaintiff is a domestic corporation; that on June 26, 1918, it rented to the defendant a certain apartment in premises known as No. 157 West Fifty-seventh street, borough of Manhattan, at the annual rental of $1,450, payable monthly in advance on the first day of each month; that defendant entered into possession of the premises, and on the 3d day of May, 1920, plaintiff and defendant agreed to a renewal of the lease for the further period of two years from October 1, 1920, at the annual rental of $2,160, payable in equal monthly installments; that defendant has failed to pay the rent of said apartment

falling due on the 1st day of October, 1920, amounting to $180, which sum is now due and owing to the plaintiff.

The answer alleges that the signing of the new lease was procured through duress and a threat on the part of the landlord to terminate the tenancy at the expiration of the term; denies that there is due the plaintiff the sum of $180; as a first affirmative defense it is alleged that on June 26, 1918, plaintiff and defendant executed a lease of said premises for two years from October 1, 1918, at the annual rental of $1,450; that on May 3, 1920, plaintiff and defendant signed what purported to be an extension of said lease for two years from October 1, 1920, at the annual rental of $2,160; that prior to the signing of the said renewal the plaintiff stated to the defendant that if he did not sign the renewal plaintiff would terminate his tenancy at the expiration of the existing term and cause him to move; that the defendant believed the said statement, and relied upon it, and was fearful that he would be unable to secure similar or suitable apartments owing to their scarcity; that solely by reason of such threats, coercion and duress, plaintiff induced defendant to sign such renewal; that defendant offers the rent for the month of October, 1920, at the old rate; and as a second affirmative defense the defendant realleges the allegations of the first affirmative defense, and further alleges that the rent reserved in the instrument of May 3, 1920, is unjust, unreasonable and oppressive.

The appeal involves the validity of chapter 944 of the Laws of 1920, which was enacted at an extraordinary session of the Legislature on the 27th day of September, 1920, and took effect on that day, and the validity of chapter 136 of the Laws of 1920, which was enacted and took effect on the 1st day of April, 1920, which it amended. Chapter 944 was enacted at an extraordinary session of the Legislature duly convened by the Governor on the 20th day of September, 1920. Chapter 944 was recommended for enactment in a report made to the Legislature on the day it convened in extraordinary session by a joint legislative committee on housing, appointed in the month of May, 1919. On the day the Legislature so convened it received a message from the Governor as follows:*

* See Senate Journal of 1920, vol. 2, Appendix II, pp. 5-13.— [REP.

" STATE OF NEW YORK — Executive Chamber,
" ALBANY, *September* 20, 1920.

" *To the Legislature:*

" I have exercised the power vested in me by the Constitution to call the Legislature into Extraordinary Session because I am convinced that an emergency confronts the State, and because I feel that we cannot wait until the regular session to find remedies for its relief.

" In the period of reconstruction, many problems have been pressing for solution which are not ordinary in their nature, but are the direct result of war conditions. None of them has so taxed the agencies of government as the question of proper housing facilities.

" In January of 1919, I charged the Reconstruction Commission with the duty of making an exhaustive inquiry into this subject to the end that the legislative and executive branches of the Government might be in a position to deal with this problem, which even at that time promised to be acute. Your Honorable Bodies, believing that facts should be produced upon which to predicate remedial legislation, appointed a Committee from both houses of the Legislature, to investigate the subject. This Committee reported at the last session of the Legislature and several legislative proposals arising from their report were enacted into law. It was admitted at the time that they were expedients intended to alleviate the situation temporarily. As we understand legislation, they were entirely regulatory. Two vital objects were overlooked; one, the encouragement of building construction, and second, the adoption of a State policy looking to the future study and development by the State of this all important question of adequate housing facilities.

" Experience of several months has revealed to us the weaknesses of the temporary expedients and has made more acute the necessity for encouragement of building operations so far as it can be done by law, and the creation of State agencies for future use.

" We, therefore, at this session, as I see it, have three distinct branches of the subject with which to deal.

" First, the strengthening of the temporary statutes enacted at the recent session.

First Department, December, 1920. [Vol. 194.

" Our temporary laws of last spring have fallen far short of what was expected of them and selfishness and greed on the part of not a few landlords has brought about an indescribable condition in the Municipal Courts in New York City. I am informed by the President of the Board of Justices of the Municipal Court that there are pending for October first, more notices of dispossess proceedings than were filed during the whole year of 1919 — approximately 100,000. The court rooms have been crowded beyond their capacity by tenants seeking relief. These figures of themselves cannot communicate the harassing uncertainty and the misery caused by the constant repetition of these proceedings. It has been publicly stated by the Health Commissioner of the City of New York that this condition of uncertainty is alone a direct menace to the health and welfare of the community. The housing shortage leaves the citizen nowhere to turn. Families have been broken up and dispersed generally through the city, or crowded and huddled into the homes of relatives until the health, welfare and morality of the community is seriously threatened.

" It seems a very great pity that the decent, honest landlord should be obliged to come under a regulation clearly not intended for him but made necessary by the willful and deliberate profiteer, who would turn this great crisis in our State's history to his personal advantage. The people, to some degree at least, have managed to protect themselves from other forms of profiteering, but they are helpless to deal with this one, because a home everyone must have. Have in mind that no regulatory legislation, properly drafted, will have any disastrous effect upon an honest man. It has been my experience that only those who seek to live outside of the moral law have any great fear of State regulation. The State has a conscience and it will regulate fairly.

" Inasmuch as regulation must be exercised through the agency of our courts, it is to existing statutes or the enactment of new ones supplementing them that we must turn our attention.

" Landlords have been given the special privilege of summary proceedings in order to regain immediate possession of their premises. This privilege does not belong to any landlord

as a matter of inherent right. Inasmuch as the evidence laid before us indicates that summary proceedings are being grievously abused, in a crisis of this kind, the State does only its duty when it withdraws or modifies them.

" There is an abundance of evidence that undesirability or failure to pay rent is not in the majority of instances the basis of the application for the writ of summary removal, but on the other hand, it is the operation of the profiteer who would remove the desirable and paying tenant in order to create a vacancy which may thereafter be offered to the highest bidder. As a result of this, families have been shifted from place to place without rhyme or reason and the unscrupulous and selfish have profited immensely by it. October first was to be the height of the harvest. The State should step in and use its power to disappoint them.

" I believe the emergency to be such that the strong arm of the State must reach through its courts and protect the people for at least one year, until the crisis shall have passed or the situation is relieved. The courts should be empowered where it is evident that the dispossess is requested for the purpose of unreasonable rent-raising, to suspend the dispossess remedy for an adequate period. You might well hold that the courts shall have the power to suspend rent increases and place the burden of proof upon the landlord to show the necessity for the increase or any part of it. No honest man can suffer from such legislation. The court will undoubtedly give its approval to increases that can be justified.

" Inasmuch as the personnel of your committee remains the same, I have no doubt that they will be in a position to suggest to you other specific amendments to the existing so-called rent laws; and that they will strengthen them where experience has proven them to be weak.

" The second phase of the question before us is how to stimulate building construction. Figures gathered from the most authentic sources indicate that the State is years behind its normal housing accommodations. Between June 1, 1919, and July 1, 1920, in the City of New York, 3,652 individual apartments designed for the same number of families were constructed, but as an offset to that new construction there were demolished or converted for non-residential uses 3,833

apartments, leaving 271 less homes at the end of that period, although the question has been constantly before the public for a year and a half.

" The housing shortage is felt not alone in the City of New York but all cities in the State are passing through the same difficulty. In New York City at least 50,000 homes are immediately necessary. It should therefore be your chief objective during the Extraordinary Session to encourage, so far as that can be done by law, the building of houses.

" The commercial and economic supremacy of the State is threatened by this shortage. No community can expect to achieve an industrial growth if it is unable to house its working population properly. Labor shortage can be frequently attributed to improper housing accommodations. It is only human for a man to want to live where he can rear his family in decency and comfort. If some other State offers him that opportunity, it comes into sharp competition with our own State, and good housing is therefore a necessity for the promotion of commerce and industry.

" The question of stimulating building growth becomes a very practical one because of the fact that the cost of building operations has trebled since 1915. Building at this time is considered an unprofitable field and money will not enter it, nor can it be forced into it by law, but we may be able to offer an inducement to capital to come back into the field and building may be resumed in a natural way if the State can find some way to offset the increased costs.

" A very vital element in the carrying cost of a newly constructed building is the taxation to which it is subject. While I do not, as a matter of policy, favor tax exemptions, the emergency is such at the present time that it might be well to consider the enactment of a law exempting from taxation for a period of years, with proper restrictions, buildings used for dwelling purposes whose construction is undertaken within such a period as will assure an immediate increase in housing accommodations. I believe this will aid in putting new construction on a fair competitive basis with buildings erected before the war and will assist in creating a market for new buildings.

" Much has been said about the exemption of mortgages

from the provisions of the State Income Tax. The State's Tax is very small and we can give no guarantee of federal legislation along the same line. I, therefore, do not place much faith in this suggestion as offering any great remedy. However, your Legislative Committee is in possession of more facts on this subject that I can lay before you.

"Loaning institutions apparently have not kept in step with the times and have spent their energy in securing investments bringing a larger return than real estate mortgages. For instance, our Savings Banks and Mutual Insurance Companies are organized not for profit but as depositaries for the people's money, and it would be entirely in keeping with their purpose if their funds were made available to a greater extent to meet the people's needs, by investing a larger portion of them in bond and mortgage.

"In 1914, there was created by statute a State Land Bank having for its purpose assistance to building and loan associations. Inasmuch as the proceeds from the sale of the bonds of the Land Bank are used for the building of homes, the State should do everything that it possibly can to make the bonds a more desirable purchase. We have already exempted them from the provisions of the State Income Tax but the abnormal yield at this time from other securities is such as to make them an undesirable investment. It might be well that the State use its own money or a portion thereof now in the various sinking funds of the State to purchase these bonds. It might also enable municipalities of the State to invest in such bonds.

"These recommendations are made in the hope that the legislation which they suggest will bring voluntary capital into the building market. That, of course, remains to be seen. If the present condition be not thus relieved and the health of the community continues to be menaced, then we have a grave public emergency to meet such as would confront us in a time of epidemic or of catastrophe. Clothed with the proper safeguards the Police power of the State should be extended to municipalities in order that they may be enabled either to build or lend their credit to the building of houses.

"Undoubtedly, the State as well as the municipalities should

be in a position to extend its credit either through the medium of the State Land Bank or a specially created agency.

" There is one avenue of possible direct State aid in an emergency which might be applied at once. The State apparently owns considerable property that was either acquired by escheat or was bought in at tax sales. It might be well to direct the Comptroller either to arrange favorable short term leases or dispose of the property, if it is to be used for housing at such prices as will encourage its development.

" It has been called to my attention by the report of the Reconstruction Commission and by hearings held before the Joint Legislative Committee and by private citizens, that the high cost of building materials is artificially stimulated. No doubt, one very vital aid to construction would be the elimination of any combinations to increase the prices of building materials. Investigation of this situation by an agency of your own creation is, to my mind, highly desirable.

" We come now to the third consideration — provision for a permanent housing policy.

" The existing accommodations are far from the standards of adequacy that a normal family has the right to expect. I was conscious that the State was facing a problem of housing, both from the fundamental point of view, and from that of the shortage in the supply, when I asked the Reconstruction Commission to study and to suggest a permanent policy for the State in this regard.

" The evils of bad housing are only too apparent in New York City — but my study and experience here have shown me that an inadequate standard of housing exists in nearly every city and town in the State. The Tenement House Law has some measure of beneficent effect, but in the smaller communities investigation shows that housing is without even elementary supervision as to safety and sanitation.

" Nor is the situation of such recent growth as is popularly supposed. Since we passed the Tenement House Law of twenty years ago, nothing constructive has been done. We rested with that achievement and every attempt to aid in developing a solution for other communities has met with failure.

" Any attempts to amend the present Tenement House Law are likely to be viewed with alarm and suspicion if they are

aimed at detailed and specific sections of the law. It is, however, probable that the law can be made to fit present conditions if it is applied with greater elasticity. I would, therefore, recommend as an aid to the construction of multi-family homes, that there be created for the tenement house department a board of appeals similar to or identical with the one at present functioning for the building department in the city of New York. If such a board is constituted, deviations from the letter of the law, which make possible new methods of construction, can be carefully considered by such a board and the law be less hampering in its effect.

" Building houses for some groups in the population has become an unprofitable business. Hence, these groups have for a generation lived in the left-over housing, or in the cheapest and most poorly-planned type of home that a grudging and unrealizing community would provide. As a result of the present emergency, a still larger portion of our population is being forced back into houses of a standard below that which we have accepted as decent American homes.

" Except for the report of the Reconstruction Commission and the findings of your own committee, we have been aided by no State agency in the consideration of this very important problem. In the enactment of labor laws, we are guided by the Industrial Commission. In the enactment of health measures, by the State Health Department. In matters affecting the conservation of our natural resources, by the Conservation Commission. The Banking Department, the Insurance Department, and other State agencies all deal with special subjects that need executive or legislative action. But in housing, dealing with the elementary need of shelter and establishing homes, there is no State or local agency to aid the legislative and executive branches of the government either in meeting an emergency, or what is more important, in helping to establish a permanent housing policy for the State. Such a policy does not necessarily mean the building of houses by the State, but it does mean the establishment of housing standards and of local development that should underlie any future growth of the cities of this State.

" Granted that Your Honorable Bodies will enact measures to meet the emergency, it is important that you recognize

the challenge which these insufferable conditions raise, to establish agencies for providing an enlightened and constantly developing housing policy for the future.

" To this end I recommend a law which will create in each community having a population of over ten thousand a local housing board, which shall be charged with the duty of finding a solution for the local housing situation. These local boards should be required to prepare within a period to be determined by the local authorities a plan for the future development of the city and should consider local housing ordinances. A State agency should be created and the local Boards should be required to report to it at stated intervals so that there may be available at all times a body of information applicable to this subject.

" The State agency, on the other hand, should first of all be directed to report to the next Legislature on a method for the development of a system of State credits for housing purposes. Through the State agency information should be made available to Local Communities that will aid them in their housing program.

" These agencies, both State and Local, should be unpaid, but so far as the State agency is concerned, adequate appropriation for its expenses should be made.

" This is the time for action. We are confronted with a real problem of reconstruction. Shall we remain in the dark ages of inadequate and un-American housing, endangering the health and morals of future generations of our citizenship? Or shall we go forward with the times, and enter the new era of our democracy with an enlightened interest in the fundamental needs of our cities and our citizenship for well-planned communities that serve the industrial, commercial and social needs of the people, and homes that make for a stabilized, self-respecting, wholesome family life.

" If this is accomplished, the sufferings caused by the housing crisis will not be without their compensation. The permanent fruits of this emergency should be written on the record which this State has made for progressive laws affecting human needs. It takes a serious emergency to bring a realization of deficiencies. The opportunity is yours to remedy them.

" (Signed) ALFRED E. SMITH."

*Louis Marshall* of counsel [*Lewis M. Isaacs* with him on the brief], for the appellant.

*Rose & Paskus*, for the respondent.

*William D. Guthrie* and *Julius Henry Cohen, Special Deputy Attorneys-General,* for the Attorney-General.

*Elmer G. Sammis* and *Bernard Hershkopf,* counsel for the Joint Legislative Committee on Housing, as *amici curiæ.*

LAUGHLIN, J.:

The statement of the facts shows the existence of a shortage of housing accommodations resulting from the increase of the population and the practical suspension of building during the World War presenting a situation threatening danger to the public health, safety and order, and calling upon the Legislature for the enactment of any emergency legislation which it was competent for it to enact to relieve the crisis and to prevent its recurrence until the emergency passed. If it was within the power of the Legislature to enact these statutes, they must be sustained for it is not the province of the court to review the exercise of the legislative discretionary power. It is, however, proper to observe that there is no just ground for criticising this legislation provided it is constitutional. The subject-matter was thoroughly investigated and the Executive and the Legislature evidently attempted in devising and applying remedies to protect the interests of landlords as well as tenants so far as that could be done consistently with the public welfare.

Said chapter 136 is an act relating to defenses in an action based on unjust, unreasonable and oppressive agreements for rent of premises occupied for dwelling purposes in cities of the first class and in cities in a county adjoining a city of the first class. It recites that unjust, unreasonable and oppressive agreements had been and were being exacted from tenants under stress of prevailing conditions impairing the freedom of contract, resulting in a congestion of housing conditions seriously affecting and endangering the public welfare, health and morals, presenting a public emergency, and provides that it shall be a defense to an action for rent accruing under an agreement, that the rent is unjust and

unreasonable and that the agreement is oppressive; but hotels, lodging and rooming houses are excepted therefrom. Section 2 creates a presumption that the agreement is unjust, unreasonable and oppressive if the rent has been increased more than twenty-five per cent over that exacted one year before the agreement was made. Section 3 permits the plaintiff in such an action or in a separate action to plead, prove and recover a fair and reasonable rent. Section 4 provides that the act shall be in force until November 1, 1922.

Chapter 944 amends chapter 136 by re-enacting section 1, but omitting therefrom the exception relating to hotels, lodging and rooming houses, re-enacting section 2 as section 3 with an amendment applying the presumption to any increase of the rent over the year before, and re-enacting section 3 as section 4, and by adding seven other sections, six of which were wholly new, and by providing that the provisions of that chapter shall continue in force until November 1, 1922. The new provisions of the chapter provide in section 2 that where the defense that the rent is unjust and unreasonable and that the agreement is oppressive is interposed, the plaintiff shall file a verified bill of particulars giving the gross income from the building, the number of apartments and of rooms in each, the number of stores, the rent received for each apartment or store for the preceding year, the consideration paid by the landlord for the building or, if he be a lessee, the rent agreed to be paid by him, the assessed valuation and taxes for the current year, the annual interest charge on any incumbrance, the operating expenses in reasonable detail and such other facts as the landlord claims affect his net income from the property, and that if he fails so to do, the complaint shall be dismissed. Section 5 provides that if the plaintiff in an action for rent or rental value recovers judgment by default and it is not satisfied within five days after entry. and service of a copy, the plaintiff shall be entitled to possession of the premises and to a warrant for possession. Section 6 provides that if in such an action the defendant interposes the defense of unfairness and unreasonableness of the amount demanded, he must at the time of answering, pay into court an amount equal to the rent paid during the preceding month or the amount agreed upon as the monthly rent by

the agreement under which he entered, and that if he fails so to do, the defense shall be stricken out, and that any deposit so made shall be applied on the judgment or otherwise as· justice requires, and if the plaintiff recovers, the judgment shall provide that if it be not fully satisfied from the deposit or otherwise within five days after entry and service of copy, plaintiff shall be entitled to possession and to a warrant therefor. Section 7 provides, among other things, that where the court has jurisdiction to vacate a judgment by default, it shall have power to open a default in such an action and to amend and correct process and to grant a new trial. Section 8 forbids a stay on appeal unless the defendant pays into court the amount of the judgment and monthly thereafter an amount equal to one month's rental on the basis of the judgment, and that such money shall be paid by the clerk to the plaintiff. Section 9 excepts hotels of 125 rooms or more, lodging and rooming houses occupied under a hiring of a week or less. Section 10, which amended section 4, excepts new buildings in the course of construction and those commenced thereafter. An explanatory note to this chapter by the joint legislative committee states that the twenty-five per cent increase clause in the former statute was omitted because generally misunderstood by the public and misapplied by the courts and that the new act puts the burden of proof with respect to the rent being just and reasonable on the landlord, if the rent has been raised, and that this was done because otherwise the tenant would be at a disadvantage and unable to meet the landlord's claim with respect to expenses. It is also stated that the purpose of the act was to prevent a landlord from obtaining an increase of rent without bringing an action and having the court determine whether the rent demanded is fair and reasonable and that the trial may be by the court or by a jury if either party so desires, and that the provision requiring the tenant to pay into court was to protect the landlord against irresponsible tenants, and that the landlord is fully protected by giving him possession if the amount recovered is not paid promptly, and that it was believed that the rights of both parties were fully protected by this act.

Chapter 945 was enacted on the same day as chapter

944. It amends subdivision 2-a of section 2231 of the Code of Civil Procedure which was added by chapter 139, enacted on April 1, 1920. Chapter 139 limited until November 1, 1922, the remedy by summary proceedings in cities of the first class and in a city in an adjoining county, under a lease or tenancy for one year or less or under any future lease or tenancy of property occupied for dwelling purposes, to cases wherein the petitioner alleged and proved that the rent was no greater than the amount paid by the tenant for the month preceding the default or had not been increased more than twenty-five per cent over the rent one year before, but hotels, lodging and rooming houses were excepted. Chapter 945 further limited for the period therein specified the remedy by summary proceedings for the non-payment of rent by confining it to cases in which the petitioner alleged and proved that the. rent demanded was no greater than the amount for which the tenant was liable for the preceding month, but permitted the tenant to defend on the ground that the rent was unjust and unreasonable and that the agreement was oppressive, and where that defense was interposed required the landlord, on pain of having his proceeding dismissed, to file a bill of particulars to the same effect as is required by chapter 944, but it excepted hotels of 125 rooms or more and lodging and rooming houses occupied under a hiring of a week or less and buildings in the course of construction and those thereafter commenced. The joint legislative committee's note to this chapter shows that it was intended to confine the landlord to his remedy by an action for rent if he claimed more than the amount for which the tenant was liable for the preceding month.

The remedy by summary proceedings is statutory and it was competent for the Legislature to withdraw it altogether or to limit it as it did. The legislation so limiting the remedy by summary proceedings left the landlord claiming the benefit of an agreement for an increased rent to an action such as this, if he did not wish to elect to accept rent for an amount no greater than the amount paid by the tenant for the month preceding the default and to have recourse to summary proceedings for the removal of the tenant for non-payment thereof.

Chapter 136 was construed as not applying to existing leases

but only to those thereafter made.   (*Paterno Investing Corp.* v. *Katz,* 112 Misc. Rep. 242; affd., without opinion, 193 App. Div. 897.)   Counsel for the appellant contends that chapter 944 is unconstitutional and void both as to future and existing leases.   I am of opinion that we are not called upon to decide whether the new provisions of chapter 944 which are not a re-enactment of the provisions of chapter 136 would be constitutional if construed retroactively as applying to existing leases, for the lease in the case at bar was made after the enactment of chapter 136, although before the enactment of chapter 944; and chapter 136 authorized the defense that the rent reserved by the agreement was unjust and unreasonable and oppressive, and the plaintiff in making the lease was chargeable with knowledge of those statutory provisions.   Chapter 944 merely enlarged and extended the provisions of chapter 136 by creating a presumption that the agreement is unjust, unreasonable and oppressive where the rent has been increased over the rent of the year before.   That is merely a rule of evidence, and ordinarily it is competent for the Legislature to change the law of evidence and procedure and apply the statute to existing contracts (*Sackheim* v. *Pigueron,* 215 N. Y. 62); but the validity of that part of the statute or of the provisions thereof making it the duty of the landlord to file a bill of particulars is not presented for decision.   Plaintiff's motion for judgment on the pleadings could not be granted unless the answer contains no defense.   It does, however, contain the defense authorized by chapter 136 and re-enacted in chapter 944, that the agreement with respect to rent was unjust, unreasonable and oppressive.   Regardless, therefore, of the new rule of evidence attempted to be prescribed by section 944 or of the provisions of that act with respect to a bill of particulars, the *issue* presented under either statute is the same and it is as to whether the rent exacted was reasonable.   The point now presented for decision is, therefore, the same as if the lease had been made after the enactment of both statutes.   The landlord stands on the lease and the tenant rests on the statutory defense that the rent reserved is unjust and unreasonable and that the agreement is oppressive.   The lease having been made after the Legislature authorized this defense, both parties are bound by the law with respect to the

*term* of the lease; and if the statute be unconstitutional, the landlord may recover according to the agreement, but if it be constitutional, he may only recover the reasonable rental to be determined by the court or by a jury if either party demands a trial by jury.

The only remaining point to be considered is whether, in the circumstances of the emergency, by which there was and would be until new houses and apartments were built this serious shortage of housing accommodations, the owners of existing houses, tenements and apartments which, in the city of New York, are occupied by far the greater part of the inhabitants as tenants, had a constitutional right to take advantage of their tenants and of others desiring accommodations and exact exorbitant rentals free from the exercise of any legislative regulation or control, or whether it was competent for the Legislature thus summoned in extraordinary session by the Executive, and fully advised with respect to these conditions, to apply this remedy to promote the general welfare and preserve the public health, safety and order, not by taking possession of private property either for public or private purposes, but by limiting during the period of the emergency such owners who saw fit to lease their premises to the recovery of reasonable rentals.

The learned counsel have presented able and elaborate arguments and briefs covering nearly the entire field of judicial decisions with respect to the validity of statutes enacted in the exercise of the police power, the scope and limits of which the courts have wisely refrained from attempting to define. I deem it unnecessary to discuss the authorities at length and shall refer only to those sufficiently analogous on the facts to light our way to a correct decision. That such exercise of the police power has never before been attempted in this jurisdiction does not prove that it does not exist. That has often been declared. (*Kujek* v. *Goldman*, 150 N. Y. 176, 178; 1 Kent Comm. 477; *German Alliance Insurance Co.* v. *Kansas*, 233 U. S. 389. See; also, Cooley Torts, 13–15.) Although the State Constitution (Art. 1, § 6) forbids the taking of private property for public use without just compensation and thereby impliedly forbids such taking for private use, and both the State and Federal Constitutions provide that no person shall

be deprived of life, liberty or property without due process of law, and the Federal Constitution affords all the equal protection of the laws (State Const. art. 1, § 6; U. S. Const. 14th Amendt. § 1), yet it is well-settled law that these provisions permit, for the public welfare, safety and health, the regulation of the use of private property and the regulation of the liberty of contract to an extent seriously affecting the use and value of property and at times destroying it and materially limiting and restricting the making of contracts. (*Lincoln Trust Co.* v. *Williams Building Corp.*, 229 N. Y. 313; *Cockcroft* v. *Mitchell,* 187 App. Div. 189, 194; *Stone* v. *Mayor, etc.,* 25 Wend. 157; *Mayor, etc.,* v. *Lord,* 17 id. 285; 2 Kent's Comm. 339.) The owner of real estate in a densely populated area may lawfully be precluded from building thereon until plans in compliance with the laws and regulations deemed necessary for the public health and safety have been filed and approved, and even after building according to existing laws the owner, while devoting his building to a particular private use, may be required to make changes and alterations therein deemed necessary for like purposes, no matter how burdensome, and his only alternative is to discontinue the use. (*Health Dept.* v. *Rector, etc.,* 145 N. Y. 32; *Tenement House Dept.* v. *Moeschen,* 179 id. 325.) So too, an owner of private property who devotes it to a use in which there is a direct public interest, such as storing and elevating grain or conducting a warehouse or an inn, subjects such use of his property to the police power of the State with respect to regulations fixing the charge to be made for the services rendered and the accommodations furnished. (*Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 id. 517, affg. 117 N. Y. 1; *Brass* v. *Stoeser,* 153 U. S. 391; *Nash* v. *Page,* 80 Ky. 539; *Girard Storage Co.* v. *Southwark Co.,* 105 Penn. St. 248.) One of the grounds recognized in the decisions cited for the intervention of the State through its police power is that such owner or owners have a monoply of the business and without such regulation might exact unjust charges. The scope of the decision in *Budd* v. *New York* (*supra*) is emphasized by the fact that Justice BREWER dissented in a vigorous opinion concurred in by Justices FIELD and BROWN, and took the point that the power to regulate should be limited to monopolies of law, as

where exclusive privileges are granted, and should not be extended to monopolies of fact, which may be broken at will by others, and he cites as an illustration the erection of an office building which may give for the time being a monopoly of the business but which may be broken by others, and in such case he was of opinion that it would not be competent for the Legislature to regulate the rentals to be charged. It is quite conclusive, I think, that there may be a monoply of housing conditions, and the Legislature had before it facts presenting a *collective* monopoly of housing accommodations in an emergency, from which no relief could be afforded through breaking the monopoly by new building for a considerable period of time, and where the landlords although not shown to be acting in concert were quite generally taking advantage of tenants and thereby presenting an intolerable condition if the owners were to be left free to exact exorbitant rentals. It is not, however, necessary now to decide whether it would be competent for the Legislature at any and all times to regulate leasing on the theory that the leasing of houses, tenements and apartments to the extent that it is carried on in this great city, where comparatively few own their own houses, constitutes an appropriation of the buildings to a use in which the public is so directly or intimately interested as to warrant its regulation in ordinary times, for that has not been attempted. During the continuance of the emergency I think it was competent for the Legislature so to regulate it. No one questions the validity of the usury laws, which have existed from time immemorial for the purpose of preventing oppression by money lenders who, without regulation by statute, could take advantage of the necessities of those desiring the use of money and exact exorbitant amounts therefor. Those laws are, I think, analogous to that now before the court, which was enacted for the purpose of preventing similar oppression by those who during the emergency have many applications for leases not only from residents of the State whose welfare is its especial concern, but competing non-residents, and are in a position to exact and are exacting unreasonable rentals, and are thus taking advantage of those who have no homes of their own and are obliged to submit to their exorbitant demands, for they are not free to contract because everywhere

they turn for shelter they are met with like exorbitant demands. This, I think, is a matter of great public concern warranting the intervention of the Legislature, which, of course, cannot compel the owners to open their doors and admit those who are without homes, for that would be a taking of the property; but it may, I think, provide that for the period of the emergency so long as they see fit to lease their property and enjoy the protection of the State, they must deal justly with their tenants. In *Chicago, B. & Q. R. R. Co.* v. *McGuire* (219 U. S. 549) a statute of Iowa prohibiting contracts between a railroad and its employees limiting the liability for injuries in advance of the injury, and providing that the subsequent acceptance by the employee of the benefits of the contract should not constitute satisfaction of the claim, was sustained as a valid exercise of the police power, not on the theory that State control over the corporation was reserved by its charter, but on the ground that it was not an undue interference with the liberty of contract preserved by the Fourteenth Amendment. In that case the court said, " In dealing with the relation of employer and employed, the Legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression." The use of the police power for the promotion of harmonious relations between capital and labor engaged in a great industry was assigned in *McLean* v. *Arkansas* (211 U. S. 539) as the ground for sustaining a State statute requiring that in determining the wages of miners, coal should be measured before being screened. The court there, after citing many decisions, said: " It is then the established doctrine of this court that the liberty of contract is not universal, and is subject to restrictions passed by the legislative branch of the government in the exercise of its power to protect the safety, health and welfare of the people." The court also placed emphasis on the fact that disputes and controversies between employers and employees were constantly arising and had been brought to the attention of the Legislature. In *Knoxville Iron Co.* v. *Harbison* (183 U. S. 13) a State statute requiring all employers to redeem in cash store orders issued in payment of wages was sustained

as a proper exercise of police power. In that case the United States Supreme Court quoted with apparent approval from the opinion of the Supreme Court of Tennessee to the effect that the statute tended toward equality between employer and employee in the matter of wages and was " intended and well calculated to promote peace and good order, and to prevent strife, violence and bloodshed," and that, therefore, without regard to the State's reserved power over corporate employers, it was valid as a general regulation with respect to individual employers as well, and as a wholesome regulation adopted in the proper exercise of the police power. The court there cited *Holden* v. *Hardy* (169 U. S. 366) as sustaining the validity of a statute regulating employment of workingmen in underground mines and fixing their hours of labor, on the grounds that it was a valid regulation of *the right to contract* and not class legislation, and that it did not deprive the parties of the equal protection of the law or abridge the immunities of the defendant as a citizen or deprive him of his property and liberty without due process of law, and was a valid exercise of the police power. The court then cites *Orient Insurance Co.* v. *Daggs* (172 U. S. 557) where a State statute providing that in an action on an insurance policy for loss or damage by fire the insurance company should not be permitted to deny that the property insured was worth at the time the policy was issued the full amount of the insurance was sustained as a valid limitation upon *the right of contract* notwithstanding the fact that the parties had contracted otherwise. In *Frisbie* v. *United States* (157 U. S. 160) the court held that the liberty of contract preserved by the Federal Constitution is not absolute and universal and may in many instances be regulated and limited, and although in that case the point presented for decision was with respect to the validity of a statute limiting the charges of a pension attorney, the opinion was not confined to the power of the Congress with respect to pensions. In *Sawyer* v. *Davis* (136 Mass. 239), where the ringing of bells and the sounding of gongs and whistles in a factory had been duly enjoined as a nuisance and was thereafter authorized by statute, it was held that the statute was a proper exercise of the police power and that it superseded the decision as between the parties. The court there express the opinion that the

Legislature could not deprive a party of a vested right to recover damages for prior injuries or the damages or costs awarded by an existing judgment, but that the Legislature might declare *for the future* " in what manner a man may use his property or carry on a lawful business," subject only to the limitation that the law must be reasonable and for the public welfare, and that the very purpose and object of the exercise of the police power is to change the rights of citizens as they previously existed, and that rights of citizens accruing after the statute are to be governed by it, but not rights which have accrued. · The New York Workmen's Compensation Law materially interferes with and regulates the making of and liability under private contracts, and its validity was challenged as in violation of the freedom of contract guaranteed by the Federal Constitution, although the statute was authorized by the State Constitution, but it was sustained as constitutional. (*New York Central R. R. Co.* v. *White,* 243 U. S. 188.) In *Wilson* v. *New* (243 U. S. 332) an act of Congress fixing temporarily the wages to be paid by carriers to certain classes of employees with whom the carriers had been unable to agree and who threatened to strike, which would have interrupted interstate commerce and might have resulted in public disorder, was sustained notwithstanding the fact that it was conceded that the Congress had no power to regulate such wages permanently. That decision supports anticipatory legislation by holding that it is not necessary for the legislative body to await the crisis which would authorize it to act, but may act in advance to avert a crisis.

In *German Alliance Insurance Co.* v. *Kansas* (233 U. S. 389) a State statute regulating the rates to be charged for fire insurance under private contracts was sustained as within the police power of the State, on the theory that the business was sufficiently " clothed with a public interest " to subject it " to be controlled by the public for the common good," and although the business was lawful, requiring no license, and the parties were free to contract or not, still the statute was not in violation of the Fourteenth Amendment to the Federal Constitution guaranteeing the liberty of contract. In *American Coal Mining Co.* v. *Special Coal & Food Commission of Indiana* (268 Fed. Rep. 563) the United States District Court .

First Department, December, 1920.          [Vol. 194.

for the District of Indiana, three judges sitting, on October 2, 1920, sustained a law authorizing a commission to fix reasonable prices to be charged for coal as a valid police power regulation, although it operated on coal theretofore mined as well as coal to be mined in the future, for it affected all sales thereafter made. That case is merely cited to show the trend of modern decisions, but it is unnecessary to go to that extent in the case at bar.

That the police power may be exercised with respect to new conditions where the public interests require it, and that a State may itself directly use public funds collected by taxation, or authorize a municipality to use them in a manner encroaching upon what has heretofore been recognized as purely private enterprises, is shown by the decisions in *Green* v. *Frazier* (253 U. S. 235), where legislation authorized by the Constitution of North Dakota, by which the State engaged in the banking business, in erecting and operating warehouses, elevators and flour mills, and in constructing and renting homes for its inhabitants, was sustained as not contravening the Fourteenth Amendment, prohibiting the taking of property for taxes without due process of law; and in *Laughlin* v. *City of Portland* (111 Maine, 486), and *Jones* v. *City of Portland* (113 id. 123; affd., 245 U. S. 217), where it was held that a city could be constitutionally authorized to buy for and sell to its inhabitants wood and coal during an emergency, and in *Holton* v. *City of Camilla* (134 Ga. 560), where it was held that a city could be empowered to establish a municipal ice plant for its inhabitants.

It is to be borne in mind that there has been no attempt to compel landlords to make leases, and so far as this statute, construed not retrospectively but prospectively, as I am construing it, is concerned, they are at liberty to discontinue using their property for the housing accommodations of others. The Legislature has provided merely that so long as they continue to use their premises during the period of the emergency, they must not take advantage of the houseless and, by leasing to the highest bidder, accommodate non-residents perhaps to the exclusion of citizens of this State, and unduly oppress residents of the State, who by duress of the circumstances may be obligated to agree to unconscionable, oppressive and

extortionate leasing contracts. Doubtless the Legislature apprehended that the legislation enacted at the extraordinary session would be attacked as unconstitutional, and the legislators may have anticipated that possibly some of the other statutes might not be sustained. It did, I think, however, exercise great foresight in framing the statute in question for, if it be sustained as constitutional, it will in its practical operation remedy, if not fully, practically every evil that it was anticipated would follow if the execution of the laws as they theretofore existed were permitted. It is manifest that the legislation was designed to avert the crisis incident to the shortage of housing accommodations that might have been brought on if hundreds of thousands of the inhabitants of this great metropolis were evicted and unable to find living accommodations and also to prevent profiteering landlords from taking advantage of the emergency, which left their business of leasing their property for such uses substantially without competition and left them in a position where they could exact unreasonable and unconscionable and extortionate rentals for the use of their property, while they were protected by the usury laws from having to pay more than six per cent on any loan of money that they had obtained or might obtain on the security of their premises. By restricting landlords to making contracts for reasonable rentals during the period of the emergency, the Legislature left nothing to be accomplished by the substitution of one tenant for another who was evicted, for all agreements for rentals thereafter made whether with tenants in possession or with new tenants were required to be reasonable. Assuming, without now deciding, that the other laws enacted at the same time, which were designed to prevent the wholesale eviction of tenants, were unconstitutional and that the landlords were at liberty to evict at the expiration of the term or to recover possession by electing to terminate the tenancy for a failure to pay the rentals agreed to be paid — there was left to the landlords no incentive to carry out their threats of wholesale evictions, provided the statute now under consideration was sustained as constitutional; and, therefore, even on the assumption stated, the eviction would be reduced to a minimum. In ordinary times, doubtless, the making of leases may well be and should be left to the regulation of the

law of supply and demand; but in this emergency there was not freedom of contract on the part of the tenants and they were subject to extortion and oppression by landlords. It is, I think, no extension of the doctrine of the authorities cited with respect to the power of the Legislature to forbid during this emergency the exacting of oppressive agreements for extortionate rentals by prohibiting the recovery of more than reasonable rentals.

The statute is also attacked on the ground that it fails to prescribe a standard by which what constitutes a reasonable rental may be decided. The Legislature might have provided that a landlord should not exact a rental by which he would receive more than a specified percentage on his investment, but if that percentage were fixed too low, the statute would be open to attack on the ground that it was confiscatory, and whether it would be sustained as constitutional or annulled as unconstitutional would then have to be determined by the very standard prescribed in this statute, namely, whether it permitted the landlord to receive a reasonable income on his investment. (*Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Des Moines Gas Co.* v. *Des Moines*, 238 id. 153; *Municipal Gas Co.* v. *Public Service Comm.*, 225 N. Y. 89.)

The Federal Lever Food Control Act, so called, declared it to be unlawful for any person to make an unjust or unreasonable rate or charge in handling or dealing in or with any necessaries or to combine with others to effect excessive prices for necessaries and, like the statute in question, it prescribes no other standard. (See 40 U. S. Stat. at Large, 276, chap. 53, as amd. by 41 id. 297, chap. 80; 40 id. 277, § 4, as amd. by 41 id. 298, § 2.) The Circuit Court of Appeals, Second Circuit, on May 26, 1920, in *Weed & Co.* v. *Lockwood* (266 Fed. Rep. 785), affirmed the denial of an interlocutory injunction to restrain the prosecution of an indictment under that statute and overruled the point that it prescribed no standard, which is the precise point now made here.

It is further contended that the statute is void on the ground that it is unjustly discriminatory, in violation of the provision of the Fourteenth Amendment of the Federal Constitution. The statute is confined to property devoted to the same use and it embraces all such property and applies only to the property; the use of which during the emergency required the

intervention of and regulation by the Legislature, and, therefore, it cannot be said that it is unconstitutional on this ground. (*Budd* v. *New York, supra; People* v. *Havnor,* 149 N. Y. 195, 205; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225, 235.)

It follows that the order should be affirmed, with ten dollars costs and disbursements.

MERRELL and GREENBAUM, JJ., concur; CLARKE, P. J., and DOWLING, J., dissent.

CLARKE, P. J. (dissenting):*

Recognizing that the courts have never yet laid down the limitations of the police power, all of the cases which I have been able to examine dealing with the subject make that power subject to the Constitution. In my judgment, the acts under consideration in these cases violate the fundamental principles of the State and Federal Constitutions, in that the result is either to take private property for public use without due compensation, which is not permissible, or to take private property for private use, which has never been allowed. They also, in my judgment, have the effect of depriving the owners of a certain class of property of due process of law, and destroy the fundamental rights of private ownership in property, which has heretofore been sedulously protected by the courts under constitutional provisions, and take away the freedom of contract in regard to specific property within a limited territory, to wit, real estate used for dwelling purposes in the city of New York.

Realizing that these questions should be submitted as speedily as possible to the Court of Appeals, and that so much has been written by so many courts, I content myself with this brief expression of dissent, and of my agreement in the views of Mr. Justice BLACKMAR in his more extended discussion of the subject in *People ex rel. Rayland Realty Co., Inc.,* v. *Fagan* (194 App. Div. 185).

DOWLING, J., concurs.

Order affirmed, with ten dollars costs and disbursements.

---

* This opinion was also handed down in the case of *Clemilt Realty Co., Inc.,* v. *Wood* (194 App. Div. 508).— [REP.