THE HERMITAGE COMPANY, Respondent, *v.* HENRY M. GOLDFOGLE
and Others, as Commissioners of Taxes and Assessments of the
City of New York, Appellants.

POTTER. AVENUE REALTY CORPORATION, Plaintiff, *v.* BENJAMIN
BURG, Defendant.

RABLO CONSTRUCTION COMPANY, INC., Plaintiff, *v.* CHARLES
MAREK and MARY MILLER, Defendants.

EDWARD J. MOBERG COMPANY, INC., Plaintiff, *v.* CHARLES MOHR,
JR., Defendant.

First Department, April 6, 1923.

**Taxation — exemption from taxation — Tax Law, § 4-b, added by Laws of
1920, chap. 949, as amended, which authorizes local authorities to
exempt from local taxation for ten years houses erected for dwelling
purposes within stated period, is constitutional — statute enacted to
relieve public emergency in housing is not " a private or local bill "
within State Constitution, art. 3, § 18, and is not violative of State Con-
stitution, art. 3, § 1 — classification of new buildings erected for dwell-
ing purposes is reasonable — statute is not invalid because exemption is
from local taxation only and does not violate equality clause of Federal
Constitution, 14th Amendment, § 1.**

Section 4-b of the Tax Law, which was added by chapter 949 of the Laws of 1920
and since amended by chapter 444 of the Laws of 1921 and chapter 281 of the
Laws of 1922, and which provides in effect that the legislative body of a county
or city or the governing board of a town, village or school district, subject to
the approval of the board of estimate and apportionment in certain cities, may
determine that until January 1, 1932, new buildings therein erected exclusively
for dwelling purposes, except hotels, and buildings of four stories or more in
height, used exclusively for dwelling purposes above the ground floor, shall be
exempt from taxation for local purposes, other than for assessments for local
improvements, during construction and so long as used or intended to be used
exclusively for dwelling purposes, provided construction was completed before
April 1, 1920, or commenced before that date and completed within two years
or within two years from the time the act took effect, which dates were extended
by the amendatory statutes, was enacted to relieve a public emergency in the
housing situation, especially in the large cities, and is constitutional.

Said statute is not " a private or local bill," within the meaning of section 18 of
article 3 of the State Constitution, which prohibits the Legislature from passing
" a private or local bill " granting to any person, association, firm or corporation
an exemption from taxation on real or personal property.

Nor is it a violation of section 1 of article 3 of the State Constitution providing
that " The legislative power of this State shall be vested in the Senate and
Assembly," for it is well settled that the Legislature may delegate to a munici-
pality the power to tax and assess for purposes of local government, and to
determine whether or not they will act under or take advantage of statutes
pertaining to such subjects as municipal government and excise.

The classification for exemption purposes of new buildings about to be erected

and intended for dwelling purposes is a reasonable and proper one and is neither arbitrary nor discriminatory, and is based on the overwhelming reason of an imperative public necessity.

The mere fact that an exemption is granted from local taxation only does not make the statute invalid.

The statute does not violate the equality clause, section 1 of the 14th Amendment to the Federal Constitution, providing that no State shall deny to any person within its jurisdiction the equal protection of the laws.

APPEAL in the first above-entitled action by the defendants, Henry M. Goldfogle and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 23d day of March, 1923, enjoining and restraining defendants from exempting new buildings planned for dwelling purposes exclusively in said city from assessment for purposes of local taxation pursuant to section 4-b of the Tax Law of the State of New York and under the provisions of the ordinance adopted pursuant to such statute by the board of estimate and apportionment of the city of New York on February 25, 1921, and also from an order entered in said clerk's office on the same day granting plaintiff's motion for judgment on the pleadings pursuant to which said judgment was entered.

Submission of a controversy, in the second, third and fourth above-entitled actions, upon an agreed statement of facts pursuant to section 546 of the Civil Practice Act.

In the first case: *George P. Nicholson*, Corporation Counsel [*William H. King* of counsel; *Isaac Phillips* with him on the brief], for the appellants.

*Carl Sherman*, Attorney-General [*Edward G. Griffin*, Deputy Attorney-General, of counsel], for the appellants.

*Samuel Untermyer*, *Louis Marshall* and *Charles C. Lockwood*, as *amici curiæ*, in support of said appeal.

*John Brooks Leavitt* of counsel, for the respondent.

*Henry M. Powell* of counsel [*Robert Girson, Jr.*, with him on the brief], as *amicus curiæ*, on behalf of R. S. S. Co., in support of judgment.

In the other three cases: *Samuel Untermyer* and *Louis Marshall* of counsel [*Charles C. Lockwood* with them on the brief], for the plaintiffs.

*Max Sheinart* of counsel, for the defendants Burg, Marek and Miller.

*Kadel, Van Kirk & Reynolds* [*James F. Donnelly* of counsel; *John Kadel* with him on the brief], for the defendant Mohr.

DOWLING, J.:

The question involved in this appeal and these three submissions of controversy is the same, viz., the constitutionality of chapter 949 of the Laws of 1920, as amended by chapter 444 of the Laws of 1921 and chapter 281 of the Laws of 1922, and the validity of the ordinance adopted by the board of aldermen of the city of New York thereunder (City Ordinance No. 112) on February 15, 1921, approved by the mayor on February 18, 1921, and by the board of estimate and apportionment on February 25, 1921.

Chapter 949 of the Laws of 1920 was enacted at an extraordinary session of the Legislature, duly convened on the 20th day of September, 1920. It was one of a series of bills (Chapters 942 to 953 inclusive) recommended for enactment in a report made to the Legislature on the day it convened in extraordinary session by a joint legislative committee on housing, appointed in the month of May, 1919.* On the day the Legislature so convened it received a message from the Governor,† dated September 20, 1920, which began by saying:

" I have exercised the power vested in me by the Constitution to call the Legislature into Extraordinary Session, because I am convinced that an emergency confronts the State, and because I feel that we cannot wait until the regular session to find remedies for its relief.

" In the period of reconstruction, many problems have been pressing for solution which are not ordinary in their nature, but are the direct result of war conditions. None of them has so taxed the agencies of government as the question of proper housing facilities.

" In January of 1919, I charged the Reconstruction Commission‡ with the duty of making an exhaustive inquiry into this subject to the end that the legislative and executive branches of the Government might be in a position to deal with this problem, which even at that time promised to be acute. Your Honorable Bodies, believing that facts should be produced upon which to predicate remedial legislation, appointed a Committee from both houses of the Legislature, to investigate the subject. This committee reported at the last session of the Legislature and several legislative proposals arising from their report were enacted into law. It was admitted at the time that they were expedients intended to alleviate the situa-

---

* See N. Y. Legis. Doc. 1920, vol. 43, Extraor. Sess. No. 11.— [REP.

† See N. Y. Legis. Doc. 1920. vol. 43, Extraor. Sess. No. 1; Senate Journal of 1920, vol. 2, Appendix II, pp. 5–13.— [REP.

‡ For Report of Reconstruction Commission on the Housing Situation, see N. Y. Legis. Doc. 1920, vol. 25, No. 78.— [REP.

tion temporarily. As we understand legislation, they were entirely regulatory. Two vital objects were overlooked; one, the encouragement of building construction, and second, the adoption of a State policy looking to the future study and development by the State of this all important question of adequate housing facilities.

" Experience of several months has revealed to us the weaknesses of the temporary expedients and has made more acute the necessity for encouragement of building operations so far as it can be done by law, and the creation of State agencies for future use.

" We, therefore, at this session, as I see it, have three distinct branches of the subject with which to deal.

" First, the strengthening of the temporary statutes enacted at the recent session.   *   *   *

" The second phase of the question before us is how to stimulate building construction. Figures gathered from the most authentic sources indicate that the State is years behind its normal housing accommodations. Between June 1, 1919, and July 1, 1920, in the City of New York, 3,652 individual apartments designed for the same number of families were constructed, but as an offset to that new construction there were demolished or converted for non-residential uses 3,833 apartments, leaving 271 less homes at the end of that period, although the question has been constantly before the public for a year and a half.

" The housing shortage is felt not alone in the City of New York but all cities in the State are passing through the same difficulty. In New York City at least 50,000 homes are immediately necessary. It should therefore be your chief objective during the Extraordinary Session to encourage, so far as that can be done by law, the building of houses.   *   *   *

" The question of stimulating building growth becomes a very practical one because of the fact that the cost of building operations has trebled since 1915. Building at this time is considered an unprofitable field and money will not enter it, nor can it be forced into it by law, but we may be able to offer an inducement to capital to come back into the field and building may be resumed in a natural way if the State can find some way to offset the increased costs.

" A very vital element in the carrying cost of a newly constructed building is the taxation to which it is subject. While I do not, as a matter of policy, favor tax exemptions, the emergency is such at the present time that it might be well to consider the enactment of a law exempting from taxation for a period of years, with proper restrictions, buildings used for dwelling purposes whose construction is undertaken within such a period as will assure an immediate

increase in housing accommodations. I believe this will aid in putting new construction on a fair competitive basis with buildings erected before the war and will assist in creating a market for new buildings."

The message of Governor Smith is set forth in full in the case of *Levy Leasing Co., Inc., v. Siegel* (194 App. Div. 482).

The entire group of statutes referred to was passed on the same day, September 27, 1920, and all the enactments were framed to meet the same emergency, existent throughout the State, and to furnish different remedies to meet the various phases of the public need. Thus some had to do with legal procedure, some with regulating and controlling the amount of rent to be charged, while this particular statute was intended to encourage the erection of new buildings and thus directly help to meet the existent emergency by furnishing additional housing facilities.

The existence of this emergency was assumed and the power of the Legislature to make suitable provision to meet it was expressly upheld, both by the Court of Appeals and the United States Supreme Court.

Thus in *People ex rel. Durham Realty Corp.* v. *LaFetra* (230 N. Y. 429, affg. 195 App. Div. 280) the Court of Appeals affirmed the constitutionality of chapter 942 of the Laws of 1920, and in the course of his opinion Judge POUND said (at p. 437): " This declared purpose draws with it the consideration of a group of statutes enacted at the same session to meet a supposed crisis which are closely related to each other; are a part of the same plan of remedial protection to the tenants in possession on October first and can be fairly understood only when considered as parts of one comprehensive design. These statutes, commonly and collectively known as the September Housing Laws, include chapters 942–953, inclusive, but chapters 943, 945, 946, 948–953, inclusive, are not directly before the court on this appeal." Judge POUND further said (at p. 444): " Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war (*Hamilton* v. *Kentucky Distilleries & W. Co.*, 251 U. S. 146, 161), earthquake, pestilence, famine and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos, demand the enactment of laws that would be thought arbitrary under normal conditions. (*Bowditch* v. *Boston*, 101 U. S. 16, 18, 19; *American Land Co.* v. *Zeiss*, 219 U. S. 47.) Although emergency cannot become the source of power, and although the Constitution cannot be suspended in any complication of peace or war (*Ex parte Milligan*, 4 Wall. 2), an emergency may afford a reason for putting forth a latent govern-

mental power already enjoyed but not previously exercised. Thus it has been held that although the relation between employer and employee is essentially private so far as the right to fix a standard of wages by agreement is concerned, Congress may establish a standard of wages for railroad employees to be in force for a reasonable time in an emergency to avert the calamity of a nation-wide strike. (*Wilson* v. *New*, 243 U. S. 332, 348; *Ft. Smith & W. R. R. Co.* v. *Mills*, 253 U. S. 206.) "

In *Levy Leasing Co., Inc.,* v. *Siegel* (230 N. Y. 634) the Court of Appeals affirmed the order of the majority of this court (194 App. Div. 482), sustaining the constitutionality of chapter 944 of the Laws of 1920. When that case reached the Supreme Court of the United States, the constitutionality of the emergency legislation was again sustained (258 U. S. 242). Mr. Justice CLARKE, writing for the majority of the court, said:

" In terms the acts involved are ' emergency ' statutes and, designed as they were by the Legislature to promote the health, morality, comfort and peace of the people of the State, they are obviously a resort to the police power to promote the public welfare. They are a consistent inter-related group of acts essential to accomplish their professed purposes.

" The warrant for this legislative resort to the police power was the conviction on the part of the State legislators that there existed in the larger cities of the State a social emergency, caused by an insufficient supply of dwelling houses and apartments, so grave that it constituted a serious menace to the health, morality, comfort, and even to the peace of a large part of the people of the State. That such an emergency, if it really existed, would sustain a resort, otherwise valid, to the police power for the purpose of dealing with it cannot be doubted, for, unless relieved, the public welfare would suffer in respects which constitute the primary and undisputed, as well as the most usual, basis and justification for exercise of that power.

" In the enactment of these laws the Legislature of New York did not depend on the knowledge which its members had of the existence of the crisis relied upon. In January, 1919, almost two years before the laws complained of were enacted, the Governor of the State appointed a ' Reconstruction Commission ' and about the same time the Legislature appointed a committee known as the ' Joint Legislative Committee on Housing,' to investigate and report upon housing conditions in the cities of the State, and a few months later the Mayor of New York appointed a similar committee. The membership of these committees comprised many men and women representative of the best intelligence,

character and public service in the State and Nation, their investigations were elaborate and thorough and in their reports, placed before the Legislature, all agree: That there was a very great shortage in dwelling house accommodations in the cities of the State to which the acts apply; that this condition was causing widespread distress; that extortion in most oppressive forms was flagrant in rent profiteering; that, for the purpose of increasing rents, legal process was being abused and eviction was being resorted to as never before; and that unreasonable and extortionate increases of rent had frequently resulted in two or more families being obliged to occupy an apartment adequate only for one family, with a consequent overcrowding, which was resulting in insanitary conditions, disease, immorality, discomfort and widespread social discontent.

" If this court were disposed, as it is not, to ignore the notorious fact that a grave social problem has arisen from the insufficient supply of dwellings in all large cities of this and other countries, resulting from the cessation of building activities incident to the war, nevertheless, these reports and the very great respect which courts must give to the legislative declaration that an emergency existed would be amply sufficient to sustain an appropriate resort to the police power for the purpose of dealing with it in the public interest.

" The argument heard in these cases and further examination of the subject confirms us in the assumption made in *Marcus Brown Co.* v. *Feldman* (256 U. S. 170, 198) that the emergency declared existed when the acts were passed."

In *Block* v. *Hirsh* (256 U. S. 135) (in which the prevailing opinion was written by Mr. Justice Holmes) the court said (referring to " The Food Control and the District of Columbia Rents Act," known as the Ball Rent Act, an emergency housing law passed by Congress for the District of Columbia, being 41 U. S. Stat. at Large, 297, 298, chap. 80, tit. 2) (at p. 154): " That the emergency declared by the statute did exist must be assumed, and the question is whether Congress was incompetent to meet it in the way in which it has been met by most of the civilized countries of the world.

" The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly, circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern. It is enough to refer to the decisions as to insurance, in *German Alliance Insurance*

*Co.* v. *Kansas,* 233 U. S. 389; irrigation, in *Clark* v. *Nash,* 198 U. S. 361; and mining, in *Strickley* v. *Highland Boy Mining Co.,* 200 U. S. 527. They sufficiently illustrate what hardly would be denied. They illustrate also that the use by the public generally of each specific thing affected cannot be made the test of public interest, *Mt. Vernon Cotton Co.* v. *Alabama Power Co.,* 240 U. S. 30, 32, and that the public interest may extend to the use of land. They dispel the notion that what in its immediate aspect may be only a private transaction may not be raised by its class or character to a public affair. See, also, *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110, 111." (See, also, *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170, sustaining constitutionality of Laws of 1920, chap. 951.)

That the question of encouragement to new building was on the mind of the court in passing on the Emergency Housing Laws is proven by the statement in the opinion of Judge POUND in the *Durham Realty Corp. Case* (*supra,* 444): " Yet the Legislature has found that in practice the state of demand and supply is at present abnormal; that no one builds because it is unprofitable to build; that those who own seek the uttermost farthing from those who choose to live in New York and pay for the privilege rather than go elsewhere; and that profiteering and oppression have become general."

It is thus apparent that the series of laws passed in 1920 at the Extraordinary Session of the New York Legislature constituted a valid exercise of the legislative power in the face of an established public emergency, and that they can and should be sustained, unless grave constitutional objections exist to the validity of some one of the particular statutes.

This brings us to the consideration of the provisions of the statute now under consideration (Laws of 1920, chap. 949), viewed as one of the series of emergency enactments.

It provides:

" Section 1. Chapter sixty-two of the laws of nineteen hundred and nine, entitled ' An act in relation to taxation, constituting chapter sixty of the Consolidated Laws,' is hereby amended by inserting therein a new section to be section four-b, to read as follows:

" § 4-b. Exemption of new buildings from local taxation. The legislative body of a county, or the legislative body of a city with the approval of the board of estimate and apportionment, if there be one in such city, or the governing board of a town, village or school district, may determine that until January first, nineteen hundred and thirty-two, new buildings therein, planned for dwelling purposes exclusively, except hotels, shall be exempt from taxation for local purposes other than for assessments for

local improvements during construction and so long as used or intended to be used exclusively for dwelling purposes, or if a building of four stories or more in height, used exclusively for dwelling purposes above the ground floor, provided construction was completed since April first, nineteen hundred and twenty, or, if not so completed, that construction be commenced before April first, nineteen hundred and twenty-two, and completion for occupancy be effected within two years after such commencement, or if now in course of construction within two years after this section takes effect.

" § 2. This act shall take effect immediately."

In 1921 was passed chapter 444 of the Laws of 1921, entitled " An act to amend the Tax Law, in relation to the exemption from local taxation of buildings planned for dwelling purposes and validating the action of local legislative bodies in granting certain exemptions." By this act the concluding words of said section 4-b, as added by section 1 of the act of 1920, " within two years after this section takes effect," were changed to read, " before September twenty-seventh, nineteen hundred and twenty-two," and the following provision was added: " The provisions of this section shall not be construed to preclude such legislative bodies from granting exemptions which do not exceed the exemption authorized by this section. Any such limited exemption heretofore granted by any such legislative body, intending or purporting to act under the authority conferred by this section, is hereby legalized, validated and confirmed."

By chapter 281 of the Laws of 1922 the time for commencement of construction of new buildings was extended to April 1, 1923, completion for occupancy to be effected within two years from commencement of work; in case of buildings in course of construction on September 27, 1920, two years thereafter were given to complete; construction was deemed to be commenced when plans had been filed with the proper authority and excavation actually and in good faith begun; the owner or architect was allowed to file a statement showing the date of filing plans and commencing excavation, whereupon the appropriate local authority should forthwith cause the facts to be investigated, and if they were found to be true a certificate to that effect was to be issued which was to be conclusive evidence of the date when the construction was commenced, for the purpose of obtaining the benefits of the act.

Acting pursuant to the power conferred by the statute, the board of aldermen of the city of New York on February 15, 1921, passed City Ordinance 112, which was approved by the mayor February 18, 1921, and by the board of estimate and apportionment February 25, 1921. (See Proc. Bd. Ald. 1921, vol. 1, p. 390;

Minutes Bd. Est. & Apport. City of New York, 1921, vol. 1, pp. 1242–1244.)   It reads as follows:

" CITY ORDINANCE No. 112.

" AN ORDINANCE in Relation to the Exemption from Local Taxation of New Buildings Planned for Dwelling Purposes in the City of New York.

" *Be it Ordained, By the Board of Aldermen of The City of New York, as follows:*

" Section 1.   Pursuant to and in accordance with the provisions of section 4-b of the Tax Law of the State of New York, as such section was added by chapter 949 of the Laws of 1920, entitled, ' An act to amend the Tax Law in relation to the exemption from local taxation of new buildings planned for dwelling purposes,' it is hereby determined that until January 1, 1932, new buildings in the City of New York planned for dwelling purposes exclusively, except hotels, shall be exempt from taxation, as herein provided, for local purposes other than assessments for local improvements during construction and so long as used or intended to be used exclusively for dwelling purposes, or if a building of four stories or more in height used exclusively for dwelling purposes above the ground floor, provided construction was completed since April 1, 1920, or if not so completed that construction be commenced before April 1, 1922, and completion for occupancy be effected within two years after such commencement, or if on September 27, 1920, in course of construction within two years after such act took effect.

" Sec. 2.   It is further ordained that such exemption shall be granted to the extent only of one thousand dollars for each living room, including the kitchens, but not including the bathrooms, in each such building, provided that the total amount of such exemption shall not exceed, for every single-family house coming within the terms of the statute, five thousand dollars of the value of the building, and for every two-family house coming within the terms of the statute, ten thousand dollars of the value of the building, and for every multi-family house coming within the statute, an amount of the value of the building equivalent to five thousand dollars for each separate family apartment therein contained.

" Sec. 3.   This ordinance shall take effect immediately upon approval by the Board of Estimate and Apportionment."

Subsequent to the amendment of section 4-b of the Tax Law in 1922 the board of estimate and apportionment on March 31, 1922, approved an ordinance adopted by the board of aldermen on March 28, 1922, and approved by the mayor on March 31, 1922, extending until April 1, 1923, the time for the commencement of construction

of new buildings for dwelling purposes in order that they should be exempt from local taxation to the extent described in said ordinance. (See Proc. Bd. Ald. 1922, vol. —, p. —; Minutes Bd. Est. & Apport. City of New York 1922, vol. 2, pp. 1940, 1941.)

On the reasonableness of the ordinance no attack is made. The sole question is the constitutionality of the statute under which the ordinance was passed.

The learned court at Special Term (N. Y. L. J. March 20, 1923) held that the statute, though in form general, was in its application local, and that it came within the prohibitions of the State Constitution (Art. 3, §§ 1, 18).

Section 1 of article 3 provides that: " The legislative power of this State shall be vested in the Senate and Assembly."

Section 18 of article 3 provides that: " The Legislature shall not pass a private or local bill in any of the following cases: * * * Granting to any person, association, firm or corporation, an exemption from taxation on real or personal property. * * * The Legislature shall pass general laws providing for the cases enumerated in this section * * *."

There is nothing particularly sacred about the classes of legislation as to which private or local bills were prohibited to be passed. The categories of prohibited subjects for private or local bills were introduced into the Constitution of 1874 in order to relieve the Legislature from the onerous duty of considering the large number of local bills usually introduced upon the enumerated topics. Until the provision of section 18 as to taxation was added in 1901, private and local laws exempting persons from taxation had frequently been passed.

The title of the act in question shows that it is one to amend the Tax Law and that it deals with the exemption from local taxation of new buildings planned for dwelling purposes. It adds a new section, 4-b, to the general Tax Law of the State. It refers to no individual or corporation, and to no specific locality. It comprehends within its scope all of the counties, cities, towns, villages and school districts of the State. Neither geographically nor politically is there any part of the State that does not come within its scope. It applies to all new buildings planned for dwelling purposes exclusively, except hotels. It puts them all within one class, upon which the exemption from taxation for local purposes other than for assessments for local improvements for the period specified may be conferred.

The same procedure is prescribed throughout the State. The legislative body of a county or of a city, or the governing board of a town, village or school district, is to apply the remedy created

by the statute, of exempting from taxation for local purposes the " new buildings therein, planned for dwelling purposes exclusively," for the period permitted by the Legislature, except that in a city the board of estimate and apportionment, if there be one in such city, must approve the determination.

It is difficult, after the most careful reading of this legislation, to understand how it is possible to characterize the bill enacted into law as a private or local bill. Such a determination involves a complete disregard of the meaning of the phrase " a private or local bill " as interpreted in literally hundreds of decisions rendered by our highest courts. These decisions begin with *Matter of New York Elevated R. R. Co.* (70 N. Y. 327), in which Judge EARL said: " The objects of these prohibitions in the Constitution were doubtless to prevent the cumbering of the statute books with a mass of private and local bills, to relieve the Legislature from the labor of considering and passing upon such bills, and to remove from the Legislature the corrupting influences which surrounded and were brought to bear upon it, as to such bills, by persons having personal and selfish interests intensely awakened, at stake * * *. And it was doubtless also one of the objects of the present constitutional restraints to secure the same ends sought by private or local bills, so far as needful, by general laws, in which the whole people would be interested, and which would therefore receive more careful attention from their legislative representatives."

In *Matter of Church* (92 N. Y. 1) an act giving to the board of supervisors in any county containing an incorporated city of 100,000 inhabitants or upwards, where contiguous territory in the county had been mapped out into streets and avenues, power to lay out, open, grade and construct the same and to provide for the assessment of damages on the property benefited, was held not to be a local law within the meaning of article 3, section 18, of the Constitution. Meeting the constitutional objection, Judge FINCH after referring to *Matter of New York Elevated R. R. Co.* (*supra*) said: " A law relating to particular persons or things *as a class* was said to be general; while one relating to particular persons or things *of a class* was deemed local and private. The act of 1881* relates to a class, and applies to it as such, and not to the selected or particular elements of which it is composed. The class consists of every county in the State, having within its boundaries a city of one hundred thousand inhabitants, and territory beyond the city limits mapped into streets and avenues. How many such counties there

* Laws of 1881, chap. 554, amdg. Laws of 1875, chap. 482, § 1, subd. 9, as amd. by Laws of 1880, chap. 365.— [REP.

46

are now, or may be in the future, we do not know, and it is not material that we should. Whether many or few, the law operates upon them all alike, and reaches them, not by a separate selection of one or more, but through the general class of which they are individual elements. The force of the law of 1881 is not localized in Kings county and confined to its territory. By its terms it applies equally to every other county which may prove to be within the constituted class. It is said there is but one such county; and so it was said there was but one elevated railroad. Neither fact at all narrowed the terms of the law. Those terms in each case were broad enough to cover every county in the State if it had the required city and the mapped territory on the one hand, or its own elevated road on the other."

In *People ex rel. New York Electric Lines Co.* v. *Squire* (107 N. Y. 593) similar legislation was held to be valid, Chief Judge RUGER saying (pp. 600, 601): " The act referred to is not subject to the condemnation expressed in section 16, article 3, for the reason that it is neither a private or local bill, nor does it embrace more than one subject. The three acts of 1884, 1885 and 1886* all relate to the same subject, viz., that of placing all electrical wires and conductors in cities exceeding five hundred thousand population, under the surface of streets, etc., subject to the control of the local authorities; and no provision is incorporated in either of these acts which is not strictly incidental to the general object intended to be accomplished.  *  *  *

" Neither is the act a local or private one within the meaning of the section referred to.  *  *  *  This act is general in its terms, applying to all cities in the State, of a certain class and to every corporation carrying on a business requiring the use of electrical wires or conductors in such cities. That the number of such cities is limited or restricted, does not make the bill a private or local one, within the constitutional meaning and intent of these words, was expressly decided in the cases referred to. How many companies there are to which this bill applies we have no means of determining, but the fact that a general law is passed regulating the operations of all such companies, in cities of the class referred to, does not constitute it a private or local bill, although it may happen that such companies are all located in one or more cities of the State."

In *Ferguson* v. *Ross* (126 N. Y. 459) Judge ANDREWS said: " Another rule evolved by the discussion of the subject is that an act embracing within its scope all the cities of the State, or all

---

*Laws of 1884, chap. 534; Laws of 1885, chap. 499; Laws of 1886, chap. 503.— [REP.

things of a certain class, is a general and not a local act, although by reason of some limitation, based on population or other condition, only a particular city or the inhabitants of a single locality can in the actual situation receive its benefits."

In *People* v. *Dunn* (157 N. Y. 528) an act (Laws of 1896, chap. 378) providing for a special jury in criminal actions in certain cases was held not to be a private or local act because restricted in its application to counties having a population of 500,000 or over.

In *Gubner* v. *McClellan* (130 App. Div. 716) the Public Service Commissions Law (Laws of 1907, chap. 429), which created two districts, the first including the counties of New York, Kings, Queens and Richmond, and which required (§ 14) the city of New York to pay the expenses and salaries of certain employees of the Commission for the First District, was likewise declared to be neither a private nor a local bill.

In *Sun Publishing Assn.* v. *Mayor* (152 N. Y. 257) the Rapid Transit Act (Laws of 1891, chap. 4, as amd.), which related to cities of over 1,000,000 inhabitants, was, for the reasons above indicated, held not to be a special law; and that decision was followed in *Admiral Realty Co.* v. *City of New York* (206 N. Y. 110) and in *Matter of McAneny* v. *Board of Estimate, etc.* (232 id. 377).

In the latter case it was, among other things, claimed that the Public Service Commission Law of 1910 (as amd. by Laws of 1921, chaps. 134, 335), adding among other provisions article 6, known as the Transit Commission Law, violated article 3, section 18, of the Constitution because it applied only to cities having a population of over 1,000,000 and that the powers specified in the act were to be exercised and carried out only by the transit commission composed of three commissioners whose jurisdiction at that time included only the city of New York. Judge MCLAUGHLIN, however, said: " The act is general in terms. It applies to *all* cities in the State having a population of a million or more. It may be conceded that at the present time it is applicable only to the city of New York, but if so it by no means follows that it was intended only for that city, since there may and probably will in the near future be one or more cities to which it will be applicable. Certainly there is no conclusive presumption to the contrary."

In *Williams* v. *People* (24 N. Y. 405) an act (Laws of 1860, chap. 508) entitled " An act in relation to police and courts in the city of New York," contained a provision (§ 33) that whenever any larceny was committed in the city and county of New York by theft from the person of another, the offender might be punished as for grand larceny, although the value of the property taken was less than twenty-five dollars. It was contended that

this act violated article 3, section 16, of the Constitution, in that it was a local bill and embraced a subject that was not named in its title. Dealing with this objection, Judge DENIO said: " The provisions of the act under direct consideration, which relate to police justices and courts and their clerks, may be considered local; but I am of opinion that the thirty-third section, which provides for an increased punishment for petit larceny, when committed by stealing from the person, in the city of New York, is not local within the meaning of the Constitution. It has, no doubt, features which savor of locality, for it punishes a well-known common-law offense more severely, if committed under peculiar circumstances within the limits of that city, than if committed elsewhere. But it prescribes the rule of conduct for all persons, whether residents of the city or of any other part of the State, and its increased penalties are intended to protect residents of other localities equally with inhabitants of the city; and it was probably intended especially for the security of strangers and sojourners, who are apt to lack the habitual caution of permanent citizens of large towns. * * * I cannot think that a statute having such consequences is to be classed with special provisions making appropriations for particular roads, public buildings, or the like, situated in particular local divisions."

*Arthur* v. *Village of Glens Falls* (66 Hun, 136) was an action to recover damages for the death of plaintiff's husband, which the complaint alleged was caused by a negligent act of the defendant.

The question presented therein was whether under chapter 440 of the Laws of 1889, which amended section 9 of title 3 of chapter 291 of the Laws of 1870, entitled " An act for the incorporation of villages," it was necessary to present the claim within one year from the time of the injury and serve notice of the time and place of the accident before the action is commenced, and to allege such presentation and notice in the complaint. The plaintiff claimed that chapter 440 of the Laws of 1889 is a local bill and hence violative of the constitutional provision that " no private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title." (See Const. art. 3, § 16.)

The court said (at p. 139): " The answer to this position is that the act in question is not a local or private bill. It applies to the whole State. The cases cited by counsel for appellant show quite clearly the distinction between a local or private bill and a general act, and do not sustain his contention [*People* v. *The Supervisors of Chautauqua*, 43 N. Y. 10; *Ferguson* v. *Ross*, 126 id. 459–464.]

" In the latter case, in the opinion, the following language is

used: ' Another rule evolved by the discussion of the subject is that an act embracing within its scope all the cities of the State, or all things of a certain class, is a general and not a local act.'

" So a bill that embraces all the villages of the State, which elect to take advantage of its provisions is a general and not a local act."

The mere fact that a statute, though general in terms, chances to be of but local application, is no objection to its validity. In *People ex rel. Central Trust Co.* v. *Prendergast* (202 N. Y. 188) Judge VANN said: " The act, however, does not amend a local law and it is not a local but a general law, for it applies to awards made pursuant to any statute of the State for damages sustained by reason of any change of grade of any street, avenue or road in the State. As was well said by Mr. Justice PAGE at Special Term: ' While it applies to awards made pursuant to a local law applicable to the city of New York, it applies to all awards of the same class made anywhere within the State. There is no limitation as to locality.' It is part of the Highway Law\* which covers the entire State and applies wherever the circumstances permit the application thereof the same as any general law."

In view of the steady trend of judicial decisions in favor of a liberal and reasonable application of the law under this constitutional inhibition, I think it may fairly be said that this statute was intended to be and was in effect a general law, and not a local or private one.

Nor does the fact that the statute delegated to the legislative body of the various political subdivisions of the State, subject to the approval of the board of estimate and apportionment in certain cities, the right to determine whether new buildings planned for dwelling purposes, except hotels, should be exempt from taxation for local purposes, excepting local assessments, destroy the validity of the enactment. It is well settled that the Legislature may delegate to a municipality the power to tax and assess for purposes of local government. (*People ex rel. Griffin* v. *Mayor, etc., of Brooklyn,* 4 N. Y. 419; *Town of Guilford* v. *Supervisors of Chenango County,* 13 id. 143; *Matter of Zborowski,* 68 id. 88, 96, 97; *Townsend* v. *Mayor,* 77 id. 542; *Genet* v. *City of Brooklyn,* 99 id. 301, 307; *Spencer* v. *Merchant,* 100 id. 585; *People ex rel. Farrington* v. *Mensching,* 187 id. 8; *Gautier* v. *Ditmar,* 204 id. 27.)

It will be remembered that the statute does not relieve from State taxation, but only from taxation for local purposes, and that the new buildings are not relieved from assessments for local improvements. Having declared a State-wide purpose to relieve new buildings to be erected under its provisions from local taxation,

---

\* See Laws of 1910, chap. 701, adding to Highway Law, § 59a.— [REP.

the Legislature left to the localities themselves the determination whether local housing conditions were such as to require a stimulus for new buildings to relieve the congestion. This, it seems to me, was a valid delegation of authority, in view of the power of localities over their local taxations.

In *People ex rel. Unger* v. *Kennedy* (207 N. Y. 533), which involved the validity of the act (Laws of 1912, chap. 548) creating Bronx county, Judge Hiscock said: " In addition to these and other more or less similar authorities the law is so familiar as to render any review unnecessary that the Legislature may delegate to municipalities and restricted localities the right to determine whether they will act under or take advantage of statutes pertaining to such subjects as municipal government and excise. As the result of these controlling authorities in this State, we have the principle well established that while the Legislature may not delegate to the people of the State the right to determine whether an enactment shall become a law, it may in cases like those specified permit the electors of a restricted locality to determine whether the provisions of a completed act passed by the Legislature shall become operative or shall be taken advantage of. That is the underlying principle, and the question is whether it should be applied or extended to such a case as the present one. There certainly is no difference in the principle involved in permitting the electors of a city to determine by vote whether they will take advantage of an act allowing the municipality to invest in a railroad, or to the electors of a county whether they will make a given change in the county seat, or to the voters of a specified territory whether they desire that an act incorporating that territory as a municipality shall become operative, and the one before us permitting the electors of a restricted district to determine whether the provisions of an act erecting that territory into a new county shall be carried out and become operative. The principle governing each case is that the Legislature having discharged its duty by framing and enacting a completed legislative plan and statute affecting the people of a limited locality may then leave it to them to say whether they do or do not desire to take advantage of the law thus passed." (See, also, *Cleveland* v. *City of Watertown*, 222 N. Y. 159.)

In my opinion, the permitted classification for exemption purposes of new buildings about to be erected and intended for residential purposes, was a reasonable and proper one. This was not a case of an arbitrary classification of existent buildings into separate groups, some of which were taxable, and some of which were not. It was an exemption from future local taxation, for a limited period,

of property which was to be created in return for that concession. It was not a bonus for something which the owner was bound to do, for he was under no obligation to build, nor could he be reasonably expected so to do, in view of the high cost of building operations. It was a bargain between the State and the owner of vacant property, by which each gained something and no one was the loser. The State gained additional housing facilities for its citizens, the owner gained an exemption from local taxes, the locality gained improved real estate subject to taxation when the period of exemption should expire. As was said in *Watson* v. *State Comptroller* (254 U. S. 122): " Any classification is permissible which has a reasonable relation to some permitted end of governmental action.    *    *    *    It is enough, for instance, if the classification is reasonably founded in ' the purposes and policy of taxation.' "

As was said by Judge VANN in *People ex rel. Hatch* v. *Reardon* (184 N. Y. 431, 443): " All taxation is arbitrary, for it compels the citizen to give up a part of his property; it is generally discriminating, for otherwise everything would be taxed, which has never yet been done, and there would be no exemption on account of education, charity or religion, and frequently it is unreasonable, but that does not make it unconstitutional, even if the result is double taxation." And further he said (at p. 444): " There is no express restriction upon this power in our State Constitution and no implied restriction, except by the primary guaranties relating to life, liberty, property and due process of law.    *    *    *    Subject to these restraints, the Legislature has supreme control of the power to tax, and its action, even if arbitrary, discriminating and unreasonable, is binding upon all persons and property within the boundaries of the State."

And at page 445: " While a tax upon a particular house, or horse, or the houses or horses of a particular man, or on the sale thereof, would obviously invade a constitutional right, still a tax upon all houses, leaving barns and business buildings untaxed, or upon all horses or the sale thereof, leaving sheep and cows untaxed, however unwise, would be within the power of the Legislature. This is true of a tax on all houses with ' more than one chimney,' or ' with more than one hearth stone,' or on all race horses. The power of taxation necessarily involves the right of selection, which is without limitation, provided all persons in the same situation are treated alike, and the tax imposed equally upon all property of the class to which it belongs." That case was affirmed in 204 United States, 152.

Again in *People ex rel. Farrington* v. *Mensching* (187 N. Y. 8) the Court of Appeals said (at p. 16): " We held [*People ex rel.*

*Hatch* v. *Reardon,* 184 N. Y. 431] that ' the Legislature has power to classify as it sees fit by imposing a heavy burden on one class of property and no burden at all upon others ' provided ' all persons and property in the same class are treated alike ' and ' the tax is imposed equally upon all property of the class to which it belongs.' In discussing the subject we said that: 'While a tax upon a particular house or horse, or the houses or horses of a particular man, or on the sale thereof would obviously invade a constitutional right, still a tax upon all houses, leaving barns and business buildings untaxed   *   *   *   would be within the power of the Legislature. *   *   *   The equal protection of the laws ' only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances.' (*Kentucky Railroad Tax Cases,* 115 U. S. 321, 337.) Or, in other words, all persons must ' be treated alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed.' (*Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293; *Hayes* v. *Missouri,* 120 U. S. 68; *Barbier* v. *Connolly,* 113 U. S. 27, 32.) "

In this connection it may be noted that the courts of the State of New York have heretofore applied without question a prior statute granting a limited exemption to new buildings, namely, section 889-a of the Greater New York charter (Laws of 1901, chap. 466, as added by Laws of 1913, chap. 324), providing that " a building in course of construction, commenced since the preceding first day of October and not ready for occupancy, shall not be assessed."

In *People ex rel. New York Central & Hudson River R. R. Co.* v. *Purdy* (216 N. Y. 704) the Court of Appeals reversed the Appellate Division (167 App. Div. 637) upon the dissenting opinion of Mr. Justice Scott, wherein he said: " The purpose of section 889a undoubtedly was to encourage building by extending to a builder a limited exemption from taxation while his building was going on. But for this section it would be the duty of the assessors in valuing a parcel of land occupied by an uncompleted building to estimate something for the partially completed improvement." This decision recognizes the encouraging of building in a particular locality as within legislative powers, and the exemption of new buildings as based on a proper classification.

In the present statute the exemption conferred is based on an overwhelming reason of an imperative public necessity. The very lives of many members of the State were threatened by the dearth of dwelling houses. The Legislature, in seeking to encourage the building of new houses, deemed it for the public interest to exempt from taxation for the period fixed by the statute houses that

would be constructed within an early date after the enactment of the law in order to meet this clearly established need. This classification which the Legislature created for the purpose of accomplishing this end was not arbitrary selection, but in full accordance with sound public policy.

It would seem clear under these decisions that the classification for purposes of local taxation into old and newly constructed buildings (the latter built in compliance with the new law) was a valid exercise of legislative power.

Nor, of course, does the mere fact that an exemption is granted from local taxation leave the act open to condemnation. As was said in Cooley on Taxation (2d ed. p. 209): " The right to make exemptions is involved in the right to select the subjects of taxation and apportion the public burdens among them, and must consequently be understood to exist in the law-making power wherever it has not in terms been taken away. To some extent it must exist always, for the selection of subjects of taxation is of itself an exemption of what is not selected; but the power to exempt even from among such subjects is more likely to be restricted than to be altogether prohibited." (Cited with approval in *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 299.) Nor are taxes, otherwise lawful, invalidated by the fact that the resultant benefits are unequally shared. (*Wagoner* v. *Evans,* 170 U. S. 588.)

Nor does the statute violate the " equality clause " of section 1 of the Fourteenth Amendment to the Federal Constitution. As was said by Mr. Justice BRADLEY in *Bell's Gap Railroad Co.* v. *Pennsylvania* (134 U. S. 232, 237): " The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the State Legislature, or the people of the State in framing their Constitution. But clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of

our governments, might be obnoxious to the constitutional prohibition. * * * We think that we are safe in saying that the Fourteenth Amendment was not intended to compel the State to adopt an iron rule of equal taxation. If that were its proper construction, it would not only supersede all those constitutional provisions and laws of some of the States, whose object is to secure equality of taxation, and which are usually accompanied with qualifications deemed material; but it would render nugatory those discriminations which the best interests of society require; which are necessary for the encouragement of needed and useful industries, and the discouragement of intemperance and vice; and which every State, in one form or another, deems it expedient to adopt."

And in *Florida Central, etc., R. R. Co.* v. *Reynolds* (183 U. S. 480) Mr. Justice BREWER said: " In the light of these decisions if the State of Florida had deemed it for the best interests of its people to encourage the building of railroads by exempting their property from taxation, such exemption could not have been adjudged in conflict with the Fourteenth Amendment, even though thereby the burden of taxation upon other property in the State was largely increased. Indeed, that was the policy of the State prior to the Constitution of 1868. And, conversely, if the State had subjected railroads to taxation, while exempting some other class of property, it would be difficult to find anything in the Fourteenth Amendment to overthrow its action. * * * These matters of classification are of State policy, to be determined by the State, and the Federal Government is not charged with the duty of supervising its action."

Nor is the decision of the Court of Errors and Appeals of New Jersey in *Braunstein* v. *Mayor & Aldermen of Jersey City* (—— N. J. L. ——; 119 Atl. Rep. ——) controlling as to the question involved herein. The fundamental question there involved was the constitutionality of a statute approved September 17, 1920, entitled "An Act to exempt from taxation for five years certain improvements to real estate." (N. J. Laws of 1920, p. 1068, chap. 355, published with N. J. Laws of 1921.) This act purports to exempt for five years from October 1, 1920, improvements to real estate erected between October 1, 1920, and October 1, 1922, "for dwelling purposes."

The court said: " The arguments of emergency and ' police power ' alluded to in the other case, are reiterated here, and it is urged that the cases of *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; and *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242, are authority for the validity of the statute under which exemption from tax is now claimed. On this phase of the case it is sufficient to say that the statutes involved in those

decisions related in no way to tax exemption, nor to any repugnancy of a State statute to a plain mandate in a State Constitution, but to statutes affecting the contract relation of landlord and tenant with which we are in no way concerned at this time, and hence we deem them inapplicable and irrelevant to the question before us, which is, whether the exemption act of 1920 if plainly in violation of the constitutional provision that property shall be assessed for taxation under general laws and by uniform rules according to its true value as it manifestly is, can be supported on any theory of ' emergency ' or of so called ' police power.' As to this, we specifically concur in the view expressed by the Supreme Court in the *Koch* case that a pressing emergency is no ground for violation of a constitutional provision, and that the ' police power,' broad as it is, cannot be exercised in defiance of constitutional limitations."

The essential differentiation between the two cases is, that while the Constitution of New Jersey provides (Art. IV, § VII, subd. 12): " Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value " (which is the basis of the decision above referred to), the Constitution of the State of New York contains no such provision, nor any equivalent thereof. The other New Jersey case cited, which was decided by the Supreme Court (*Koch* v. *Essex County Board of Taxation*, — N. J. L. —; 116 Atl. Rep. 328), did not reach the Court of Errors and Appeals, but was approved by them in the *Braunstein* case.

It is to be noted that the only two States whose Constitutions contain no requirement for equality in taxation are New York and Connecticut. As was said in Gray on Limitations of Taxing Power (at pp. 647, 648): " The whole tendency of recent constitutional enactment in the States is to confine the discretion of the Legislature to narrower limits. The general attitude of the State courts is not so pronounced in this respect; still the courts, interpreting these Constitutions, while giving due weight to the co-ordinate authority of the Legislatures, have been compelled to recognize the limits which the people have set on the legislative power. To this general tendency of thought and law, the States of New York and Connecticut are the most conspicuous exceptions. In both of these States there are no express requirements of equality in taxation; and the courts go to the extreme in upholding the acts of the Legislature."

We have before us for consideration what seems to me to be plainly by its terms a general bill, applicable to the whole State, to meet an emergency declared to exist in the lack of proper housing facilities for the citizens of the whole State, at least so far as its cities are concerned. The power of determining whether local

conditions call for the application of the general law is left to the local legislative bodies (the board of aldermen in New York city having the power of boards of supervisors in counties), with the approval of the board of estimate and apportionment where such a board exists in a city. The evil sought to be remedied being a scarcity of houses and homes for its citizens, the State, to encourage the building of new dwellinghouses — an object desirable for the health, morals and safety of its people — offers to those owning unimproved land, as an inducement to undertake building operations at the time when they were the most expensive in history, exemption from local taxation (except assessments) for a period of years. The State is not seeking to raise money, but to have dwelling houses built. It is not a question of creating new taxable property, but of housing its citizens. It does not classify old houses in various groups, but puts new dwelling houses thereafter built in a class which can be temporarily exempted from local taxation by local legislative bodies. It is conceded that the Legislature could have exempted new buildings throughout the State from taxation. But the need may not exist elsewhere. This act is not limited to New York city, though the need is greatest there, but the statement is made in the briefs that other cities have availed themselves of its provisions. Property owners, relying upon the promise of the State and the city, improve their vacant land with dwelling houses to a very large amount, and some have sold the houses thus built, the buyers relying on their non-taxability. The State, a year after the original act was passed, validated the action taken by local legislative bodies, thus reasserting its belief in the principle applied and inviting new investments in new buildings. This validation it had power to enact. (*Matter of Stubbe* v. *Adamson,* 220 N. Y. 459.) It seems to me that the failure to tax these new dwellings for local purposes for ten years is by no means such a burden upon owners of old houses as the restrictions as to the amount of rent to be collected and the disruption of contractual relationships provided by others of these Emergency Housing Laws, which the highest courts of the State and nation have upheld. The State and city have loyally joined in seeking to have the court uphold this legislation, which has accomplished much good already and promises a still greater amelioration in housing conditions. It would be a grave misfortune if the door to further improvement in these intolerable conditions should be closed, and those who had invested their money in reliance upon the good faith of the State and city should find their capital in jeopardy. In my opinion, the legislation was wise and justifiable and is free from taint of unconstitutionality.

I recommend, therefore, that the judgment and order herein should be reversed, with costs to appellants, and the motion for judgment denied, with ten dollars costs, and the complaint dismissed with costs, and that in the submissions of controversy judgment should be entered in favor of the plaintiffs, without costs.

Smith, Page, Finch and McAvoy, JJ., concur.

In the first case: Judgment and order reversed, with costs to appellants, and motion for judgment denied, with ten dollars costs, and complaint dismissed, with costs. In the other three cases: Judgments directed in favor of plaintiffs, without costs. Settle orders on notice.